IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-01431-PAB-DW

VIESTI ASSOCIATES, INC.,

      Plaintiff,

v.

PEARSON EDUCATION, INC. and
JOHN DOE PRINTERS 1-10,

      Defendants.

---

## ORDER

---

This matter is before the Court on a Motion for Summary Judgment filed by

defendant Pearson Education, Inc. ("Pearson") [Docket No. 52]. This Court has subject

matter jurisdiction to decide this motion pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

Viesti Associates, Inc. ("Viesti") is a stock photograph agency based in Durango,

Colorado that licenses photographs to publishers. Docket No. 58 at 4, ¶ A. Pearson

publishes educational textbooks and is incorporated in Delaware. Docket No. 50 at 1-2,

¶ 3. Between 1990 and 2009, photographer Wolfgang Kaehler granted Pearson limited

licenses to reproduce his photographs in various educational publications. Docket No.

58 at 4, ¶ B. Pearson's compliance with the terms of those licenses forms the basis of

this suit. Docket No. 1.

---

[1]The following facts are undisputed unless otherwise indicated.

Viesti became involved in copyright litigation against Houghton Mifflin Harcourt Publishing ("Houghton").  After noticing that Mr. Kaehler licenced photographs to Houghton, Viesti contacted Mr. Kaehler about the possibility of joining the case.  Docket No. 52 at 3, ¶ 4; Docket No. 52-4 at 5, 89:2-18.

On January 15, 2010, Mr. Kaehler signed the Copyright Assignment and Accrued Causes of Action Agreement (the "First Assignment") which stated:

> The undersigned photographer, the sole owner of the copyrights in the undersigned's images ("the Images") selected by Viesti Associates, Inc. ("Viesti") and now included in Viesti's collection, hereby grants to Viesti all copyrights and complete legal title in the Images.  Viesti agrees to reassign all copyrights and complete legal title back to the undersigned immediately upon resolution of infringement claims brought by Viesti relating to the images.

> The undersigned agrees and fully transfers all right, title and interest in any accrued or later accrued claims, causes of action, choses in action – which is the personal right to bring a case – or lawsuits, brought to enforce copyrights in the Images, appointing and permitting Viesti to prosecute said accrued or later accrued claims, causes of actions, choses in action or lawsuits, as if it were the undersigned.

Docket No. 52-6.  The sole purpose of this assignment was to allow Viesti to represent Mr. Kaehler in a lawsuit against Houghton.  Docket No. 52 at 4, ¶ 7; Docket No. 58 at 3, ¶ 7.  The Assignment covered only those photographs that Mr. Kaehler licensed to Houghton.  Docket No. 58 at 4, ¶ D.[2]

On March 15, 2010 Mr. Kaehler and Viesti entered into the Photographers Non-Exclusive Agency Agreement (the "Agency Agreement"), which provided Viesti with the

---

[2] On February 9, 2010, Mr. Kaehler sent Viesti an email and spreadsheet indicating that the assignment was only for those images included in the spreadsheet. Docket No. 52-7 at 3.  These images were ones that Mr. Kaehler had licensed to Houghton.

right to license and sell Mr. Kaehler's digital files and to initiate and settle lawsuits related to Viesti's use of the files.  Docket No. 58 at 5, ¶ E.  The agreement stated that Mr. Kaehler was the "sole and exclusive owner of all digital files delivered to [Viesti], now and in the future."  Docket No. 52-8 at 2, ¶ 1.

Viesti claims that, upon realizing that Pearson may have infringed on Mr. Kaehler's copyrights to the photographs at issue in this case (the "Pearson Photographs"), Mr. Kaehler transferred the applicable copyrights to Viesti.  Docket No. 58 at 5, ¶ G.  Viesti claims that this was done in a November 26 and 27, 2010 email exchange (the "email exchange") wherein Mr. Kaehler sent Viesti a spreadsheet identifying the Pearson Photographs.  Docket No. 58 at 5, ¶ H; *see* Docket No. 58-3 at 15-35.  Mr. Viesti and Mr. Kaehler stated that they believed that the Pearson Photographs would be subject to the First Assignment and Agency Agreement without the need for additional documentation and that it was their intent to assign to Viesti copyrights to the Pearson Photographs.  Docket No. 58-1 at 2, ¶ 5; Docket No. 58-3 at 2, ¶ 8.

Pearson disputes that the November 2010 email exchange effectuated a transfer of rights and argues that Mr. Kaehler's statements to that effect are contradicted by his deposition testimony.  Docket No. 72 at 3, ¶¶ G, I.[3]  Pearson asserts that the November 2010 spreadsheet was part of the process of creating Exhibit 1 to the Complaint [Docket No. 1-1] as evidenced by the fact that the email and spreadsheet were

---

[3]Pearson filed a Motion to Strike the Declarations of Wolfgang Kaehler [Docket No. 71], arguing that both of Mr. Kaehler's affidavits were in conflict with his deposition testimony.  *See* Docket No. 58-3; Docket No. 58-4.  For the reasons stated below, the Court need not reach the issues raised in Pearson's motion to strike.

originally withheld as work product.  *Id.*

On January 6, 2012, Mr. Kaehler signed an "Addendum to Copyright Assignment and Accrued Causes of Action Agreement" (the "Addendum") which reiterated an intention to convey "the copyrights and claims so that Viesti has legal standing to enforce copyrights in the Images."  Docket No. 52-11.  The parties disagree as to the purpose of the Addendum.  Mr. Kaehler's affidavits state that his intent throughout was to "transfer the necessary copyrights and claims to Viesti . . . and give Viesti legal standing to bring copyright infringement claims, relating to the [Pearson Photographs]."  Docket No. 58-3 at 2, ¶ 8.  However, in his deposition, Mr. Kaehler stated that he understood the Addendum to clarify, but not expand, already existing rights.  Docket No. 52-2 at 16-17, 125:14-126:10.

On June 1, 2012, Viesti filed this action bringing claims against Pearson for copyright infringement, contributory copyright infringement, and a claim for copyright infringement against John Doe Printers 1-10.  Docket No. 1.  Viesti claims that Pearson had only limited licenses for Mr. Kaehler's photographs, and that Pearson exceeded the terms of the limited licenses.  Docket No. 58 at 1.

On March 6, 2013, Viesti and Mr. Kaehler signed a document entitled "Copyright and Accrued Causes of Action Assignment" (the "Second Assignment") which stated, in relevant part, that Mr. Kaehler was assigning to Viesti "co-ownership of the copyrights in the Images not previously assigned to Viesti."  Docket No. 52-12.

On June 25, 2012, Pearson filed a Motion to Dismiss, arguing that Viesti lacked standing to sue for copyright infringement.  Docket No. 12.  The Court denied Pearson's Motion to Dismiss, refusing to consider documents attached to Pearson's motion, but

granting Pearson leave to file a motion for summary judgment on the issue of standing.
Docket No. 45.  Pearson filed a Motion for Summary Judgment on the issue of standing
[Docket No. 52], which is the motion now before the Court.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when
the "movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if
under the relevant substantive law it is essential to proper disposition of the claim.
*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes
over material facts can create a genuine issue for trial and preclude summary
judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An
issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a
verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.
1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate
burden of persuasion at trial, it may satisfy its burden at the summary judgment stage
by identifying a lack of evidence for the nonmovant on an essential element of the
nonmovant's claim."  *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th
Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998))
(internal quotation marks omitted).  "To prevail at summary judgment on standing
grounds, the defendant must show that the record is devoid of evidence raising a

5

genuine issue of material fact that would support the plaintiff's ultimate burden of proving standing." *Day v. Bond*, 500 F.3d 1127, 1132 (10th Cir. 2007). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

Where, as here, the issue of standing is raised on a motion for summary judgment, "to prevail on such a motion 'a plaintiff must establish that there exists no genuine issue of material facts as to justiciability.'" *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002) (quoting *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999)). Plaintiff must support its allegations "with the manner and degree of evidence required at the [summary judgment] stage[] of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

## III.  ANALYSIS

### A.  The Copyright Act

Under the Copyright Act of 1976, Congress granted copyright owners the specific

and exclusive rights:

> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.  The list of exclusive rights is exhaustive – "[i]f a right is not 'specified,'

then it is not one of the exclusive rights granted by Congress."  *Silvers v. Sony Pictures*

*Entm't, Inc.*, 402 F.3d 881, 886-87 (9th Cir. 2005).  However, "exclusive rights may be

chopped up and owned separately, and each separate owner of a subdivided exclusive

right may sue to enforce that owned portion of an exclusive right, no matter how small."

*Id.*

Section 501(b) of the Act defines under what circumstances copyright owners

have standing to bring a suit against infringing parties.  For a plaintiff to assert a claim

for copyright infringement, it must be (1) the "legal or beneficial owner of an exclusive

right under a copyright" and (2) entitled "to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b).[4] Although the Tenth Circuit has not decided this specific issue, the weight of authority interprets § 501(b) as authorizing suit *only* by legal or beneficial owners.  *See HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 381 (7th Cir. 2011) ("the Copyright Act spells out who has enforceable rights under the statute; someone who does may sue, and someone who does not has failed to state a claim upon which relief may be granted"); *see also Silvers*, 402 F.3d at 885 ("Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement." (emphasis original)); *Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 938 (7th Cir. 1993) (prohibiting licensing agent from joining copyright infringement suit pursuant to § 501(b)).

Legal owners are those with legal title to at least one exclusive right.  *Silvers*, 402 F.3d at 886.  Beneficial owners are those without legal title, but with an interest in royalties or licensing fees flowing from an exclusive right.  *Id.*; *see also Moran v. London Records, Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987) (defining beneficial owner as one who has "the right to receive royalties from the copyright's exploitation") (citations

---

[4]Any copyright owner bringing suit is subject to the requirements of § 411, which provides, among other things, that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."  17 U.S.C. § 411(a).  In *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), the Supreme Court held that § 411(a) imposed a non-jurisdictional precondition – copyright registration – that plaintiffs ordinarily must satisfy before filing copyright infringement claims.  *Id*. at 157. Pearson has filed a Motion for Summary Judgment [Docket No. 81] challenging Viesti's compliance with the registration requirement.

and quotations omitted). In order to bring a claim, both legal and beneficial owners must show that they are the owners of at least one exclusive right set forth in § 106. *Hyperquest*, 632 F.3d at 382. Conversely, the holder of a nonexclusive license has no standing to bring an infringement claim. *Id.*; *see also Granite Music Corp. v. Center St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 724 (W.D.N.Y. 2011) ("A non-exclusive licensee does not have standing to commence a copyright infringement action."); *Swarovski Am. Ltd. v. Silver Deer Ltd.*, 537 F. Supp. 1201, 1204 (D. Colo. 1982) (same).

Where a plaintiff's only legal interest in a copyright is the right to bring an accrued claim, courts have strictly applied the standing requirements set forth in § 501(b). "The right to sue for an accrued claim for infringement is not an exclusive right under § 106." *Silvers*, 402 F.3d at 884. Therefore, "[t]he bare assignment of an accrued cause of action" does not meet the standing requirement of § 501(b). *Id.* at 890. One rationale for the strict application of § 501(b), adopted in both the Second and Ninth Circuits, is that "the Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991); *see also Silvers*, 402 F.3d at 890 (citing *ABKCO*).[5]

---

[5]In resolving this motion, the Court need not decide under what circumstances, if any, the assignment of accrued claims is permissible. The Tenth Circuit has not decided this question; however, the Second and Ninth Circuits have held that the transferee of accrued claims may bring an infringement action provided the transferee is an owner of "*both* the copyright *and* [the] accrued claims." *Silvers*, 402 F.3d at 890 (citing *ABKCO*, 944 F.2d at 980). Under those circumstances, accrued claims may only be assigned if expressly included in the assignment. *ABKCO*, 944 F.2d at 980.

The only exclusive right at issue in this case is the right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 106(3).  Because Pearson challenges Viesti's standing to bring a claim, the primary question before the Court is whether the agreements between Mr. Kaehler and Viesti transferred legal or beneficial ownership of that exclusive right.

### B.  Challenges to Standing Pursuant to § 501(b)

Viesti argues that Pearson should not be permitted to challenge the assignments between Mr. Kaehler and Viesti.  Docket No. 58 at 12.  Viesti cites to *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27 (2d Cir. 1982), *superseded by statute on other grounds*, 15 U.S.C. § 1125(a), for the proposition that, where a copyright holder and licensee have no dispute over the formality of an assignment, "it would be anomalous to permit a third party infringer to invoke this provision against the licensee." *Id.* at 36.  However, the Second Circuit's holding in *Eden Toys* was limited to the issue of whether the copyright owner and defendant engaged in the necessary procedural formalities under 17 U.S.C. § 204(a).  The Second Circuit remanded to the district court for a determination of whether the copyright owner actually conveyed an exclusive license.  *Id.* at 36-37; *see also Minden Pictures, Inc. v. Pearson Educ., Inc.*, 929 F. Supp. 2d 962, 970 (N.D. Cal. 2013) (rejecting argument that defendant cannot challenge the validity of copyright assignments between plaintiff and copyright owner).  Moreover, the Court "must raise the standing issue *sua sponte*, if necessary, in order to determine if it has jurisdiction."  *United States v. Colo. Supreme Ct.*, 87 F.3d 1161,

1166 (10th Cir. 1996) (citing *Orr v. Orr*, 440 U.S. 268, 271 (1979)).  Accordingly it is

proper for the Court to consider Pearson's arguments on the issue of standing.

### C.  Contract Interpretation

The Court turns to the interpretation of the agreements between Mr. Kaehler and

Viesti.  *See Nafal v. Carter*, 540 F. Supp. 2d 1128, 1140-41 (C.D. Cal. 2007) ("the Court

must examine the interstices of the various agreements, and consider their combined

effect").  "It is the substance of the agreement, not the labels that it uses, that controls

our analysis."  *HyperQuest*, 632 F.3d at 383.  When construing copyright agreements,

traditional rules of contract interpretation apply.  *Kennedy v. National Juvenile Detention

Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) (applying Wisconsin law to construe copyright

agreement); *see also SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1209-10 (10th

Cir. 2009) (applying California law and holding that agreements transferring copyrights

must be read as a whole); *Righthaven LLC v. Wolf*, 813 F. Supp. 2d 1265, 1272 n.6 (D.

Colo. 2011) (applying Colorado law).  Pearson's brief indicates that Colorado law

controls the interpretation of the agreements in this case [Docket No. 52 at 10], while

Viesti's briefs are silent on the issue.  Finding no compelling reason to apply the law of

another state, the Court will apply Colorado law in interpreting the agreements at issue.[6]

---

[6]The Agency Agreement contains a choice of law provision indicating Colorado
law applies.  Docket No.  52-8 at 4.  Neither the First Assignment, the Addendum, nor
the Second Assignment contains a choice of law provision.  Viesti is based in Colorado,
appears to be the party responsible for drafting the agreements, and the relationship
between the parties appears to be centered in Colorado; thus, where Viesti is silent on
the issue, the Court concurs with Pearson's assessment that Colorado law applies.
*See In re AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007)
(holding that, under Colorado's choice of law analysis, the state with the most
significant relationship to the occurrence and the parties for any particular issue
supplies the relevant substantive law).

Under Colorado law, "[i]nterpretation of a written contract is a question of law for the court." *In re Marriage of Thomason,* 802 P.2d 1189, 1190 (Colo. App. 1990) (citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo. 1984)).  The primary goal of contract construction is to determine and effectuate the intent and reasonable expectations of the parties.  *Copper Mountain Inc. v. Industrial Sys., Inc.,* 208 P.3d 692, 697 (Colo. 2009).  Contract language must be examined and construed consistently with the plain and generally accepted meaning of the words employed.  *Id.*; *see Pepcol Mfg. Co.,* 687 P.2d at 1313-14 ("In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning.").  "The court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless."  *Copper Mountain, Inc.*, 208 P.3d at 697 (internal quotation marks omitted).  "Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract."  *USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997); *see also Pepcol Mfg. Co.*, 687 P.2d at 1314 ("It is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence.").

Ambiguity is also decided as a question of law.  *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005).  "A contract is ambiguous when it is reasonably susceptible to more than one meaning." *Public Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006).  Much like standard contract interpretation, "[i]n determining whether a provision in a contract

is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the agreement's provisions." *Lake Durango Water Co., Inc. v. Public Utilities Comm'n*, 67 P.3d 12, 20 (Colo. 2003).  Because "courts no longer apply a rigid 'four corners' rule . . . extrinsic evidence may be conditionally admitted to determine whether the contract is ambiguous." *East Ridge of Fort Collins*, 109 P.3d at 974 (citation omitted).  "A mere disagreement between the parties as to the interpretation of an agreement does not in itself create an ambiguity as a matter of law." *City of Aurora v. ACJ P'ship*, 209 P.3d 1076, 1085 (Colo. 2009).

### 1.  First Assignment

The First Assignment was executed on January 15, 2010.  Docket No. 52-6.  It is undisputed that the First Assignment pertains only to those images invoiced to Houghton and for the purposes of resolving the dispute with Houghton.  Docket No. 52 at 3, ¶ 5; Docket No. 58 at 2, ¶ 5.  Moreover, Viesti no longer argues that this assignment transferred any legal interest in the Pearson Photographs.  Docket No. 58 at 9-11.  Accordingly, the Court finds that the First Assignment does not transfer any legal or beneficial ownership in copyrights to the Pearson Photographs.

### 2.  Agency Agreement

Viesti argues that the Agency Agreement, executed on March 15, 2010, transfers the necessary ownership interest in the copyrights to the Pearson Photographs.  Docket No. 58 at 9.  Viesti characterizes the agreement as granting it "co-ownership of exclusive rights to . . . authorize publishers to reproduce, distribute and display

Kaehler's photographs."  Docket No. 58 at 9.  Although the agreement's title –

"Photographers Non-Exclusive Agency Agreement" – appears to indicate a contrary

intent, the Court will consider the agreement's substance, and not simply its label.  *See*

*HyperQuest*, 632 F.3d at 383.  The Agency Agreement's first paragraph states:

> I, the undersigned certify and warrant that I am the sole and exclusive owner
> of all digital files delivered to you, now and in the future.  I appoint you as a
> non-exclusive agent and representative in respect of the leasing and sale of
> said materials throughout the world.   All negotiations shall be at your
> discretion without prior consultation with me, except when outright purchase
> of originals is to be negotiated.

Docket No. 52-8 at 2, ¶ 1.  The agreement goes on to state that Mr. Kaehler and Viesti

will evenly split any fees that Viesti collects [*id.* at 2, ¶ 2] and that the agreement shall

run for five years with an automatic renewal [*id.* at 3, ¶13].

    The Agency Agreement does not grant Viesti exclusivity over one of the rights

identified in Section 106.  To the contrary, the Agency Agreement only appoints Viesti a

"non-exclusive agent and representative" entitled to lease and sell Mr. Kaehler's

photographs and does not indicate that Mr. Kaehler is in any way transferring his

ownership in the right to lease or sell the images.  Moreover, the Court cannot accept

Viesti's characterization of the agreement as granting "co-ownership" since that term

does not appear in the agreement and the plain meaning of the agreement does not

purport to convey to Viesti any ownership interest in a copyright.  *See HyperQuest*, 632

F.3d at 382 ("a person holding a non-exclusive license is not entitled to complain about

any alleged infringement of the copyright); *Granite Music Corp.*, 786 F. Supp. 2d at 724

(finding non-exclusive right to license insufficient to create standing).

    Viesti argues that, because the agreement grants it 50% of "the total sum billed

and collected by [Viesti]," it "'stand[s] to benefit from the legal dissemination of copyrighted material'" and therefore Viesti is a beneficial owner.  Docket No. 58 at 10 (quoting *Righthaven LLC v. Wolf*, 813 F. Supp. 2d 1265, 1271-72 (D. Colo. 2011)).  The Court declines to interpret the term "beneficial owner" so broadly.  Legislative history indicates that a "'beneficial owner' for this purpose would include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."  H.R. Rep. No. 94-1476, at 159 (1976).  While beneficial ownership is not necessarily "restricted to those in a copyright's legal chain of title," *Moran*, 827 F.2d at 182, a beneficial owner's economic interests, which give rise to standing, are "derived from *the use of the copyright by its legal owner*."  *Fantasy, Inc. v. Fogerty*, 654 F. Supp. 1129, 1131 (N.D. Cal. 1987) (emphasis original).  Viesti has no claim, under the Agency Agreement, to royalties from Mr. Kaehler's use of the copyright.  Because Viesti's economic interests are derived solely from its own use of the copyright and not from the use of the copyright by its legal owner, Mr. Kaehler, Viesti is not a beneficial owner pursuant to § 501(b).  Viesti does not reconcile its position with the well-settled rule that nonexclusive licensees lack standing to bring an action and cites no authority to support its claim that a nonexclusive license holder qualifies as a beneficial owner simply because it stands to benefit generally from its own exploitation of the copyright.

Finally, the Agency Agreement provides that: "In the event of . . . the unauthorized use of images by [Viesti's] client, I give [Viesti] full and complete authority to make claims or institute suit, in [Viesti's] name if necessary, without further permission from me."  Docket No. 52-8 at 2, ¶ 3.  To the extent Viesti argues that this

15

language transfers an exclusive ownership interest in the right to bring a suit against

Pearson, the Court disagrees.  First, the right to bring suit is not an exclusive right set

forth in § 106 and, as such, is insufficient to provide standing.  *See Silvers*, 402 F.3d at

884.  Second, Viesti's right to bring suit is non-exclusive because it is limited to only

those infringements committed by Viesti's clients – Mr. Kaehler retains the right to

prosecute all other infringements, which is inconsistent with Viesti's co-owner theory.

Accordingly, the Court finds that the Agency Agreement does not transfer to Viesti legal

or beneficial ownership of an exclusive right.

### 3.  Email Exchange

Viesti claims that the email exchange that took place between Mr. Kaehler and

Mr. Viesti on November 26 and 27, 2010 functioned as a transfer and assignment of

the copyrights in the Pearson Photographs.  Docket No. 58 at 11.  Viesti states,

"Kaehler agreed to transfer to Viesti copyrights in the images he had licensed to

Pearson.  That transfer was accomplished on November 27, 2010, when Kaehler e-

mailed Viesti the Spreadsheet." *Id.*  This argument is problematic on many levels.

First, Viesti did not raise this argument in opposition to Pearson's motion to dismiss for

lack of standing despite the email exchange now being claimed as the source of its

standing.[7]  *See* Docket No. 20.  Second, the email exchange bears no indicia of a

---

[7]Defense counsel avers that, during discovery, Viesti withheld the email exchange between Viesti and Mr. Kaehler on privilege grounds, listing the emails in a privilege log as a "communication between clients requesting information to assist counsel in rendering legal advice."  Docket No. 72-1 at 1-2, ¶ 4.  Defense counsel states that the emails were first produced as an exhibit to Mr. Kaehler's declaration, dated March 29, 2013 – three days after the Court ruled on Pearson's motion to dismiss.  *See* Docket No. 58-3; Docket No. 45.

transfer of copyrights.  As a threshold matter, Viesti must show the existence of an enforceable contract between Viesti and Mr. Kaehler.  A party asserting the existence of an agreement must show that "the parties agreed upon all essential terms."  *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986).  The email exchange began on November 26, 2010, when Mr. Kaehler wrote, "I just finished putting the Pearson info together.  666 images.  Now I am adding the copyright registrations.  I hope to get it to you by Monday.  Have a good weekend."  Docket No. 58-3 at 15-16. On November 27, 2010, Mr. Viesti responded, "Thank you for your e-mail & tremendous efforts.  I hope you are taking some time to also relax & enjoy the weekend."  *Id.*  Later that day, Mr. Kaehler responded, "Here is the spreadsheet.  I will be leaving early Wednesday," and went on provide his travel schedule and contact information.  *Id.*  The spreadsheet lists Mr. Kaehler's photographs by description, copyright registration date, registration number, and licensing information.  *See* Docket No. 58-3 at 17-35.  While evidence of conduct, oral statements, and writings is admissible for the purposes of determining whether a contract exists, the emails contain no indication as to the existence of essential contract terms or conditions.  *See I.M.A.*, 713 P.2d at 888.

Moreover, the Copyright Act adds an additional requirement to agreements transferring copyrights: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  A writing purporting to transfer copyright

ownership "must evidence the transfer with reasonable clarity." *Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 340 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2014 WL 295854, at *9 (N.D. Cal. Jan. 27, 2014) ("a transfer of copyright ownership must be express and clear").[8]  In *Weinstein*, the plaintiff brought a breach of contract action and argued that an email exchange between it and the defendant copyright co-owner codified a prior oral agreement to transfer exclusive distribution rights and satisfied § 204(a).  664 F. Supp. 2d at 341.  Plaintiff's representative sent two emails indicating that the two sides had reached an agreement, but defendant's email responses were "noncommittal."  *Id.*  The court found that if "a copyright owner's intention in writing is unclear – even deliberately so – there is no legally valid transfer." *Id.* at 341.  Moreover, "a valid writing must nevertheless clearly identify the deal and its basic parameters."  *Id.* at 342.  Thus, because "there is no way to read [defendant's] e-mails as constituting an intention to grant plaintiff an exclusive license," the court found that the § 204(a) writing requirement was not met and dismissed plaintiff's breach of contract claim.  *Id.* at 343; *see also Radio Television Espanola S.A. v. New World*

_____

[8]The purpose of § 204(a) is to protect the creator of a work from inadvertently transferring an interest in a copyright.  *Weinstein Co.*, 664 F. Supp. 2d at 340.  Some courts hold that, where there is no disagreement between the owner and licensee, it is inequitable to allow a third party to invoke § 204(a) against the licensee.  *See, e.g.*, *Eden Toys*, 697 F.2d at 36.  Although the concern of inadvertent transfer is not present in this case, Congress did not expressly limit the application of § 204(a) to disputes between the copyright owner and the transferee.  Thus, § 204(a) guides the interpretation of the agreements at issue in this case.  *See, e.g.*, *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2014 WL 295854, at *9 (N.D. Cal. Jan. 27, 2014) ("The Court's conclusion that the agency agreements do not convey ownership is underscored by the fact that a transfer of copyright ownership must be express and clear." (citing *Weinstein Co.*, 664 F. Supp. 2d at 338)).

*Entm't, Ltd.*, 183 F.3d 922, 928 (9th Cir. 1999) (holding faxes between the parties discussing terms insufficient to satisfy § 204(a)).  Although Viesti claims that the purpose of the email exchange was to transfer copyright ownership, the emails themselves provide no suggestion that the transfer of copyright ownership was at issue or in any way contemplated by the parties.  Mr. Kaehler did not indicate that the spreadsheet accomplished a transfer and neither party makes reference to other agreements, the terms of such a transfer, or any other language indicating finality.  *See Radio Television*, 183 F.3d at 928.

Viesti relies on Mr. Kaehler's declarations, where Mr. Kaehler states that he understood that providing the spreadsheet to Viesti would function as a transfer of copyrights, accrued causes of action, and licensing rights.  Docket No. 58-3 at 2, ¶ 8. However, Mr. Kaehler's declarations filed during litigation are insufficient to create a disputed issue of fact to the extent his declarations are conclusory and self-serving, *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010), or create a sham issue of fact.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) ("courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").[9]

Mr. Kaehler's deposition was taken on March 14, 2013.  *See* Docket No. 52-2.

---

[9]A declaration cannot be disregarded merely because it conflicts with the declarant's prior sworn testimony; rather, courts consider: "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks*, 796 F.2d at 1237.

Mr. Kaehler testified:

> Q.   So you testified earlier that you were aware at that time of two to three agreements that you'd entered into with Mr. Viesti, is that correct?
>
> A.   Yes.
>
> Q.   And we've marked [the First Assignment, the Agency Agreement, and the Addendum] three agreements between you and Mr. Viesti, correct?
>
> A.   Yes.
>
> Q.   Do you and Mr. Viesti have any other agreements regarding your photographs?
>
> A.   Not that I'm aware of.

Docket No. 52-2 at 28, p. 212:11-20.  On March 29, 2013, Mr. Kaehler signed his declaration, which stated that the spreadsheet was to function as an assignment of his copyrights.  Docket No. 58-3 at 2-3.  The email exchange and spreadsheet were not evidence newly discovered after the deposition; rather, Mr. Kaehler testified that he "put the spreadsheet together with the invoice numbers" to help prepare Exhibit 1 to the complaint.  Docket No. 72-2 at 3, p. 57:10-13.  Moreover, the excerpts of Mr. Kaehler's deposition provided by the parties do not indicate confusion on the part of Mr. Kaehler. *See Franks*, 796 F.2d at 1237.  Thus, Mr. Kaehler's declaration is suspect to the extent it contradicts his deposition testimony and attempts to create a disputed issue of fact as to whether the parties intended that the emails and spreadsheet function as a transfer of copyright ownership to the Pearson Photographs.  *See Minden Pictures*, 929 F. Supp. 2d at 969 (finding declarations intended to "backdate the contracts for 123 of the copyrighted photographs" were "tainted by the influence of litigation" and did not show "any intent to transfer any *specific* legal (or beneficial) ownership").  Moreover, Viesti

produces no evidence of the parties' contemporaneous "conduct, their oral statements[, or] other evidence illuminating the circumstances surrounding the making of [the alleged] agreement" that support Mr. Kaehler's after-the-fact statements that he intended that the emails should function as a transfer of ownership.  *See I.M.A.*, 713 P.2d at 888.

Second, even if the Court assumes that the email exchange, the spreadsheet, and Mr. Kaehler's declaration construed as a memorandum of transfer, *see* Docket No. 58 at 11 n. 49, constitute a contract under Colorado law, the Court does not interpret the alleged agreement as transferring to Viesti legal or beneficial ownership.  Mr. Kaehler states:

> It was my intent and understanding that by providing the Spreadsheet to Viesti, I was assigning to Viesti copyrights and claims in these additional photographs, and including them in the [various agreements.]  My intention throughout all my dealings with Viesti . . . was and is to transfer the necessary copyrights and claims to . . . give Viesti licensing rights . . . and give Viesti legal standing . . . .

Docket No. 58-3 at 2, ¶ 8.  Mr. Kaehler's declaration does not indicate an intent to assign a specific exclusive right, provide for the distribution of royalties or other compensation, or place a duration on the assignment unrelated to litigation.  *See* Docket No. 58-3 at 2, ¶¶ 8-9.  The declaration does not evince any intent on the part of Mr. Kaehler to assign Viesti any interest beyond what might be necessary to bring a claim.  Moreover, as discussed above, absent any specific reference to a prior agreement or other manifestation of finality, the act of emailing a spreadsheet, by itself, is insufficient to satisfy § 204(a).  *See Radio Television*, 183 F.3d at 928.

Mr. Kaehler further states that he understood that the transferred copyrights

would be subject to the First Assignment, Agency Agreement, Addendum, and Second Assignment. *Id.* Docket No. 58-3 at 2, ¶ 8. Even if the emails and spreadsheet made appropriate reference to those other agreements, *see Radio Television*, 183 F.3d at 928, Viesti's argument fails. The Pearson Photographs cannot be subject to the First Assignment because it is undisputed that the First Assignment covers only those images related to a suit against Houghton and the First Assignment does not provide for the subsequent transfer of additional images. *See* Docket No. 52-6. To the extent the spreadsheet photos are subject to the Agency Agreement, for the above-stated reasons, the Agency Agreement does not confer upon Viesti legal or beneficial ownership. Finally, as discussed below, neither the Addendum nor the Second Assignment transfers to Viesti the necessary rights and neither agreement was in existence in November 2010.

Extrinsic evidence submitted by the parties does not create an ambiguity in the alleged agreement. When asked if the copyright assignment was only for the purpose of bringing suit, Mr. Kaehler answered, "Yes." Docket No. 52-2 at 6, 109:7-12. Mr. Kaehler stated that, to his knowledge, Viesti has neither licensed nor paid royalties for any of the photographs at issue in this case. Docket No. 72-2 at 4-5, 92:21-93:5. Mr. Viesti's declaration similarly fails to aid Viesti's argument. Mr. Viesti states that, subsequent to the Agency Agreement, Viesti licensed Mr. Kaehler's images to customers. Docket No. 58-1 at 1-2, ¶ 4. This does not suggest the transfer of legal or beneficial ownership because, as noted above, the Agency Agreement transferred only a non-exclusive license. Mr. Viesti also states that it was his intent that the November 27, 2010 email and spreadsheet act as a transfer of all copyrights and accrued causes

22

of action.  Like Mr. Kaehler's declaration, Mr. Viesti's statements are similarly "tainted

by the influence of litigation" and do not indicate that the parties' intent was to transfer

*specific* exclusive rights.  *See Minden Pictures*, 929 F. Supp. 2d at 969.  Conversely, in

his deposition, Mr. Viesti states "we understood that we needed to have these forms to

have legal standing in the federal copyright cases . . . ."  Docket No. 52-3 at 8-9,

251:25-252:2.  When asked whether copyrights generally were assigned to Viesti for

any other purpose, other than bringing copyright claims, Mr. Viesti replied, "They were

not – they were brought just for the purposes of the present claims that we have.

Present and past claims, copyright lawsuits."  *Id.* at 9, 252:18-22.[10]

Viesti's final argument is that Mr. Kaehler's affidavit is a signed writing that

effectuates the transfer of the Pearson Photographs pursuant to 17 U.S.C. § 204.

Docket No. 58 at 11.  Viesti cites *Eden Toys*, 697 F.2d at 36, for the proposition that

§ 204(a) requirements can be satisfied by a later execution of a writing that confirms the

prior agreement.  However, the language contained in Mr. Kaehler's declaration cannot

be interpreted as conveying legal or beneficial ownership in an exclusive right

regardless of whether it is viewed as evidence of the existence of an agreement or as a

fully executed written agreement.  Moreover, even assuming Mr. Kaehler's declaration

satisfied § 204(a), Viesti must show it has standing pursuant to § 501(b), and "[t]he

existence of federal jurisdiction ordinarily depends on the facts as they exist when the

complaint is filed."  *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989);

---

[10]Because Mr. Kaehler's declarations are insufficient to convey to Viesti the
exclusive rights necessary to create standing to bring this action, the Court need not
decide Pearson's motion to strike Mr. Kaehler's declarations [Docket No. 71].

accord *Lujan*, 504 U.S. at 598 n.4 (1992).  While it may be permissible to amend a

defective allegation of jurisdiction, a party cannot amend defective jurisdictional facts as

Viesti attempts to do here.  *See Newman-Green*, 490 U.S. at 832 (interpreting 18

U.S.C. § 1653).[11]  Therefore, Viesti's argument fails and the Court finds that the

November 27, 2010 email did not transfer to Viesti legal or beneficial ownership of an

exclusive right.

### 4.  Addendum

The Court turns to the Addendum, executed by Viesti and Mr. Kaehler on

January 13, 2012.  The Addendum states:

> The undersigned previously assigned copyrights and accrued claims in the undersigned's images ("the Images") to Viesti Associates, Inc. ("Viesti"). Viesti agreed to reassign all copyrights and complete legal title back to the undersigned immediately upon resolution of infringement claims relating to the Images.

> For avoidance of doubt, it was and is the intention of the undersigned to convey to Viesti, fully and without reservation, the copyrights and claims so that Viesti has legal standing to enforce copyrights in the Images.  If any provision of the previous assignment is deemed to be inconsistent with Viesti's standing to bring claims, such provision is void and shall have no effect.

Docket No. 52-11.  Pearson argues that the Addendum does not transfer to Viesti any

---

[11]Viesti cites to *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428-29 (9th Cir. 1996), for the proposition that "under some circumstances a prior oral grant that is confirmed by a later writing becomes valid as of the time of the oral grant, even if the writing is subsequent to the initiation of litigation on the copyright infringement." However, *Magnuson* is distinguishable.  Unlike the instant case, the trial court found that a proper transfer of copyright ownership took place.  *Id.*  The Ninth Circuit did not disturb the trial court's findings, but also noted that the subsequent written transfer of copyright ownership was between two companies owned by the same person – effectively eliminating the possibility that the transferor would be harmed by a fraudulent transfer.  *Id.*

new rights; rather, it simply reaffirms the transfers that already took place.  It is unnecessary to decide this issue, however, because whether the Addendum modifies an existing transfer or transfers new rights, it does not confer on Viesti legal or beneficial ownership over the copyrights to the Pearson Photographs.  The Addendum only speaks to the intent to give Viesti "legal standing" and is completely silent as to any transfer of exclusive rights to the Pearson Photographs.  *See Silvers*, 402 F.3d at 884 ("The right to sue for an accrued claim for infringement is not an exclusive right under § 106."); *Minden Pictures*, 929 F. Supp. 2d at 968-69 (interpreting similar language and finding "the sole function of the copyright assignment is to grant an exclusive license to bring suit and divvy up any returns; there is no right to participate in any royalties apart from the litigation").

The Court finds that the Addendum is unambiguous, even when considering extrinsic evidence.  Mr. Kaehler's declaration simply reiterates, with minor changes, the language of the Addendum.  Docket No. 58-3 at 2, ¶ 9.  Mr. Kaehler's second affidavit [Docket No. 58-4] is similarly unavailing.  Mr. Kaehler testified that his intent in signing the Addendum was to clarify that all copyrights would revert back to him after the conclusion of any lawsuits.  Docket No. 52-2 at 16, 125:10-22.

The Addendum's final clause purporting to void any provision of the "previous assignment" deemed inconsistent with "Viesti's standing to bring claims" does not aid Viesti's argument.  The Court is under no obligation to reshape the parties' contract. *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1171 (9th Cir. 2013).  "[T]he parties' intended result was invalid" and reforming the agreements "in light of that intent could

not have saved [them]."  *Id.*; *see also Minden Pictures*, 929 F. Supp. 2d at 968-69 ("Implicitly, the contracting parties intended for [plaintiff] to bring the instant suit and not for it to be a genuine, potentially-permanent owner of any exclusive rights under Section 501(b).").  "Although the assignment of the bare right to sue is permissible, it is ineffectual" when it is the only right plaintiff was assigned.  *Righthaven*, 813 F. Supp. 2d at 1273.  Accordingly, because the only reasonable interpretation of the Addendum is that its sole function is to convey to Viesti the bare right to bring suit, the Court finds that the Addendum does not confer upon Viesti legal or beneficial ownership of an exclusive right.[12]

### 5.  Second Assignment

To the extent that Viesti argues that the Second Assignment, executed on March 6, 2013, is relevant to its standing argument, the Court disagrees.  As stated above, federal jurisdiction is determined based on facts as they existed at the time the complaint was filed.  *Newman-Green*, 490 U.S. at 830.  A party cannot attempt to amend defective jurisdictional facts once litigation has commenced.  *See id.* at 832.  Because the Second Assignment was executed after this action was filed, it cannot be the mechanism through which Viesti acquired the necessary rights.  *See also Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2013 WL 1995208, at *9 (N.D. Cal. May 13,

---

[12]For the foregoing reasons, it is not necessary to reach the issue of whether, under Colorado law, the Addendum properly modified any existing agreements.  *See Colo. Inv. Servs., Inc. v. Hager*, 685 P.2d 1371, 1376-77 (Colo. App. 1984) (holding that written contract can be modified by subsequent agreement).  *But see Colowyo Coal Co. v. City of Colo. Springs*, 879 P.2d 438, 443 (Colo. App. 1994) ("In order to accomplish the substitution of a new contract for an existing contract, the pre-existing obligation must be extinguished; mere modification of certain contract terms does not suffice.").

2013) (finding that plaintiff could not establish standing based upon assignment executed after the commencement of litigation).  Thus, the Court need not decide whether the Second Assignment's language transfers to Viesti the necessary copyright ownership because it did not transfer a legal or beneficial ownership interest prior to the filing of this action.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Viesti lacks standing to bring this action.[13]  It is therefore

**ORDERED** that defendant's Motion for Summary Judgment [Docket No. 52 (public entry Docket No. 53)] is **GRANTED**.  It is further

**ORDERED** that defendant's Motion to Strike the Declarations of Wolfgang Kaehler [Docket No. 71], Defendant's Motion for Summary Judgment [Docket No. 81], and Plaintiff Viesti Associates, Inc.'s Motion for Partial Summary Judgment [Docket No. 82] are **DENIED** as moot.  It is further

**ORDERED** that this case is dismissed and defendant may have its costs.

DATED March 19, 2014.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[13]Viesti notes that the Court can order Mr. Kaehler's joinder "if the Court believes Kaehler should be joined."  Docket No. 58 at 15.  However, the issue raised in Pearson's motion for summary judgment is Viesti's standing to bring this action and not whether it is appropriate to order Mr. Kaehler's joinder.  The Court will not order Mr. Kaehler's joinder.